## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 18-17812-MER |
| REVOLAR TECHNOLOGY, INC. | ) | |
| EIN: 82-3714017 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DISCLOSURE STATEMENT TO AMENDED PLAN OF REORGANIZATION
## DATED JULY 29, 2019

This Disclosure Statement ("Disclosure Statement") has been prepared by Revolar Technology, Inc. ("Revolar" or "Debtor"), to accompany its Plan of Reorganization Dated July 29, 2019 ("Plan") a copy of which is attached hereto as Exhibit A. This Disclosure Statement is being provided to all creditors and interest holders of Revolar. This Disclosure Statement is subject to approval pursuant to 11 U.S.C. § 1125 by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and interest holders to determine whether to accept the Debtor's Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Plan. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing which is scheduled for _____, 2019 at __:00 _.m. at the United States Bankruptcy Court, U.S. Customs House, 721 19th Street, Courtroom C, Denver, Colorado 80202.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.

The Plan of Reorganization is the governing document or contract between the Debtor and creditors once it is confirmed by the Court. In the event of any inconsistencies between the Plan and this Disclosure Statement, the Plan supersedes the Disclosure Statement and will be the sole court-approved document that governs the post-confirmation relationship and agreements between the parties.

This Disclosure Statement is provided to you along with a copy of the Debtor's Plan and a Ballot to be used for voting on the Plan. Please complete the Ballot according to the

1

instructions contained on the Ballot if you intend to vote for or against the Debtor's Plan. Each creditor or interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtors at the address set forth below:

> Jeffrey S. Brinen
> Kutner Brinen, P.C.
> 1660 Lincoln St., Suite 1850
> Denver, Colorado 80264

This Ballot must be received by Kutner Brinen, P.C. no later than **5:00 P.M. on _____ \_\_, 2019** which is the date set by the Court as the last day to vote on the Plan. Terms contained in this Disclosure Statement, which are defined in the Plan, have the same meaning as set forth in the definitional section of the Plan.

**Recommendation**. As set forth below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor. **The Debtor strongly believes that confirmation of the Plan is in the best interest of creditors and recommends that all creditors entitled to vote on the Plan vote to accept the Plan.**

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

**Voting Classes**. Each holder of an Allowed Claim in Classes 1 and 2 shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan**. Unimpaired classes are conclusively presumed to accept the Plan pursuant to 11 U.S.C. § 1126(f). Class 2 is unimpaired under the Plan.

**Deemed Rejection of Plan**. Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to 11 U.S.C. § 1126(g). No class will receive nothing under the Plan and therefore there are no classes deemed to have rejected the Plan.

**One Vote Per Holder.** If a holder of a Claim holds more than one Claim in any one

Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## I.      CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows a debtor to retain its assets during administration of their Chapter 11 case as a debtor-in-possession. Following confirmation of the Plan, Chapter 11 allows the debtor to distribute its remaining assets in accordance with the priority set forth in the Bankruptcy Code.

The Plan of Reorganization divides creditors into classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All interests are also classified and treated alike. Each Class of creditors or interest holders is either impaired or unimpaired under the Plan. A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable, and contractual rights to which each creditor in the class is entitled. Alternatively, a claimant is "unimpaired" if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to the default.

On November 28, 2019, the Debtor filed a motion requesting the Court set a bar date for filing claims and requests for allowance of administrative expense claims under 11 U.S.C. § 503(b)(9). On December 3, 2018, the Court entered an Order establishing January 18, 2019 as the last day for: a) filing Proofs of Claim for a pre-petition claim or interest; and b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. § 503(b)(9) must be filed ("Bar Date").

The Plan provides that Claims of all Classes shall be allowed only if such claims are either: (a) evidenced by a timely filed Proof of Claim; or (b) appear in the Debtor's Schedules and are scheduled as disputed, contingent, or unliquidated unless subsequently allowed by the Court. Creditors may check as to whether or no their claims have been scheduled as disputed, contingent, or unliquidated by reviewing the Debtor's Schedules and amendments thereto filed by the Debtor in the Bankruptcy Court for the District of Colorado. Alternatively, creditors may contact Debtor's counsel or the Debtor directly to determine how their claims have been scheduled.

Chapter 11 does not require that each holder of a Claim against or Interest vote in favor

of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two-thirds in amount (excluding insider acceptance) of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, the Plan may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtor.

Each class of creditors who is impaired will have an opportunity to vote on the Plan. In the event the requisite majority of each class votes to accept the Plan, the Plan will be deemed accepted by the subject class. If a class of creditors votes to reject the Plan, the Plan may be confirmed over the rejection of the class pursuant to 11 U.S.C. § 1129(b).

## II.    OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following three (3) classes. Treatment of each of the Classes is discussed in greater detail below and in the Plan. The following table summarizes the Classes, whether or not each such Class is impaired, and to the extent determinable, the treatment of each Class.

| Class | Impairment | Treatment |
|---|---|---|
| 1 -  Priority Claims in Section 507(a)(4) and (5) | Impaired | 100% Distribution on the Effective Date of the Plan, or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims.  Insiders with allowed Class 1 Claims shall only be paid after all Class 2 creditors are paid in full |
| 2 - Unsecured Creditors | Impaired | Class 2 creditors shall be paid 100% of the principal amount of their allowed claims, plus |

| | | interest at the rate of 4% per annum. Class 2 creditors shall receive a pro-rata distribution equal to 40% of the Gross Revenue generated from the Effective Date of the Plan through December 31, 2021, and sixty (60%) percent of the Gross Revenue generated from January 1, 2022 through the end of the four-year Plan term, less the amount necessary to pay any Administrative Claimant and Unclassified Priority Claimant. |
|---|---|---|
| 3 - Interest in Revolar held by Steve Bachar and Victor Lazzaro | Unimpaired | Class 3 Interest holders shall retain their interest in Revolar. |

### III.       BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

The Debtor is a Delaware corporation authorized to do business in Colorado, and has the leading mobile personal emergency response system ("MPRS") devices on the market.  Revolar holds multiple patents and trademark protection pertaining to such MPRS devices, which it markets and sells, primarily through its website and from an Amazon platform.

Inspired to action by her sister twice being sexually assaulted before the age of 18, Jackie Ros founded Revolar, Inc., a Delaware corporation, in 2015.  Revolar, Inc. launched its first MPRS product known as the "Classic" in 2016, and launched its "Instinct" product in 2017. Revolar, Inc. generated revenue of $1.2M in its first year in business and was on track to generate $2.1M in 2017.  The company raised more than $6M in funding and by early Fall 2017 had an oversubscribed Series A preferred stock fundraising round at a $20M valuation.  Before closing on that funding round, upon information and belief, there was dissension among certain of Revolar Inc.'s officers and directors.  Thus, the board chose to put Revolar, Inc. into an Assignment for the Benefit of Creditors.

In November 2017, Empowerment Capital and Volante Capital partnered to purchase Revolar Inc.'s assets and renamed the company Revolar Technology Inc. (hereinafter, "Revolar"), which is the Debtor.  Since that time, the production delay issue has been solved, the initial sales channels reestablished, and new channels opened.  In addition there have been two

new product launches: a line of jewelry that included the response system technology, and 911 emergency connectivity for a monthly subscription. The jewelry line has since been abandoned due to poor market acceptance, but the 911 emergency connectivity remains in place.

Historically, the company has generated sales via its own website and Amazon. The company has received tremendous free media coverage in media outlets such as the Denver Business Journal, Forbes, Tech Crunch, and Denver Post[1], all of which has contributed to creating a strong brand identity and led to early strong sales. Since taking over, the new owners have reestablished the traditional sales channels and have opened up new institutional sales channels via partnerships with, among others, Ameren Energy in St Louis, the Boulder, CO based Davis Phinney Foundation, MoxiWorks, and the Screen Actors Guild.

The device currently sells for $79.99 at full retail, with discounts available for longer term partners. Connectivity to the 24/7 monitoring service is also available for $9.99 a month.

In addition to its current tethered option, meaning an application in the user's cell phone, Revolar has a working model of an untethered device. Its current software/firmware can readily be modified to provide the backbone for both tethered and untethered products giving it a first-mover advantage and partnering opportunities. The MPERS market is quickly becoming a focus of telecom carriers globally. Like the home monitoring and security business, the MPERS space offers an opportunity for the global wireless carriers to take a solution that has been owned by smaller, stand-alone technology companies and make it their own. The global public and personal safety market is expected to grow to over $50 Billion by the year 2023, at a compound annual growth rate of 13%. Most carriers are targeting having 50 IoT[2] devices to offer their consumers by 2020 and MPERS is a key target for them.

Part of the financing for the purchase of Revolar's assets was accomplished via the issuance of convertible notes to individuals (the "Notes"). The Notes matured on July 15, 2018. In the weeks prior to the maturity date, the company's management received agreement from all but the largest noteholder to extend the maturity date. Despite ongoing attempts by management

---

[1] See https://www.bizjournals.com/denver/news/2017/11/28/wearables-startup-revolar-finds-new-life-new.html; https://www.forbes.com/sites/forbestreptalks/2017/07/05/a-27-year-old-founder-decides-she-needs-a-grown-up-to-run-revolar-her-safety-device-startup/#69af1bb02256; https://techcrunch.com/2017/04/24/revolar-the-personal-safety-button-can-get-you-out-of-tight-spots/; https://www.denverpost.com/2017/11/27/revolar-is-back-in-business-after-local-investors-buy-assets-of-denver-panic-button-maker/

[2] The Internet of Things or "IoT" for short, involves extending the power of the Internet beyond computers and smartphones to a range of other things. For example, sensors that collect information about soil moisture would be connected to an irrigation system that can turn off or on as needed based upon the information.

to address that noteholder's concerns, that noteholder ultimately came together with one other noteholder and one creditor to file into involuntary Chapter 7 bankruptcy case against Revolar on September 5, 2018.  In October 2018, Revolar converted the involuntary Chapter 7 into a voluntary Chapter 11 in order to preserve value for all of its investors and creditors.

## IV.    DESCRIPTION OF ASSETS

The following is a brief description of the Debtor's assets with valuations provided by the Debtor.  Further information on the Debtor's assets can be found in the bankruptcy Schedule B, and amendments thereto:

| Asset | Petition Date Value | Value as of June 30, 2019 |
|---|---|---|
| | | |
| Checking Account | $3,038 | $10,327 |
| Accounts Receivable | $3,545 | $0.00 |
| Finished Goods (inventory) | $219,713 | $211,111 |
| Tooling and Equipment | $230,429 | $230,429 |
| IP including patents | Unknown | Unknown |
| | | |
| Total | $456,725 | $451,867 |

The values of the assets are based on the anticipated liquidation value.  The IP including patents is very difficult to value at this point, as much will depend upon the pending litigation over Revolar's Infringement Claims.  Also, at this time the Debtor lacks the significant resources required to obtain an expert opinion as to value.

The Debtor does not own any real property.

The Debtor made no payments to any third party during the ninety days prior to filing or to insiders during the one year period to filing.  As a result, the Debtor is not aware of any avoidance actions.

## V.    DESCRIPTION OF LIABILITIES

### A.    Priority Claims

### 1.    Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim.  Wage Claims are the claims entitled to priority pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) as

unsecured claims for pre-petition wages and contributions to employee benefit plans up to the amount of $12,850 for each individual. The Debtor did not schedule any claims under § 507(a)(5), and there were no proofs of claim filed pursuant to § 507(a)(5). The Debtor scheduled two claims under § 507(a)(4) in the amount of $12,850 each for insiders Steven Bachar and Victor Lazzaro. One creditor, Jamie Lindsay, filed a proof of claim seeking an allowed claim of $12,850 pursuant to § 507(a)(4). Mr. Lindsay's proof of claim was filed late, and in any event, Mr. Lindsay may not be entitled to a priority wage claim.

Pursuant to § 507(a)(4) commissions owed to independent contractors are eligible for priority only if certain conditions are met. For commissions owed to independent contractors to qualify for priority, the independent contractor must have been acting as such for the debtor with regard to the sale of goods or services in the ordinary course of the debtor's business. Lindsay was an independent contractor, and was not acting in a capacity that involved the sale of goods or services. Rather, he handled communications for the Debtor, such as drafting press releases and powerpoints for presentation to potential investors. For these reason, Mr. Lindsay may not entitled to a priority claim pursuant to § 507(a)(4). Insiders with allowed Class 1 Claims shall only be paid after all Class 2 creditors are paid in full.

### 2.  Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in 11 U.S.C. § 503(b) or § 1114(e)(2) entitled to priority pursuant to 11 U.S.C. § 507(a)(2), including but not limited to: the actual, necessary costs and expenses incurred after the Petition Date to preserve the estate and operate the Debtor's business, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) payment of professional fees; (c) fees payable to the trustee; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court. The Administrative Claims included professional fees incurred during the case which remain unpaid, including attorney fees and costs for Kutner Brinen, P.C. and Sheridan Ross PC.

The Debtor retained Kutner Brinen, P.C. ("KB") as its bankruptcy counsel. The Court approved the Debtor's employment of KB on November 27, 2018 *nunc pro tunc* to October 30, 2018. The Debtor provided KB a retainer in the amount of $10,223, which was approved by the Court on December 10, 2018,  KB estimates that the total legal fees and costs for KB due from the Debtor will increase by approximately an additional $20,000 as of the estimated date on

which the Plan will become effective.  The fees could increase or decrease depending on the level of litigation over the Plan.

The Debtor also engaged Sheridan Ross PC as special counsel ("Sheridan") to pursue patent infringement claims ("Infringement Claims") on behalf of the Debtor.  On March 28, 2019, the Court approved of the Debtor entering into a Retention Agreement with Sheridan. Sheridan specializes in all legal matters involving intellectual property and has been doing so for over 65 years.  In addition to more than 40 attorneys in its Denver office, Sheridan has technical specialists that provide a full range of intellectual property services to in-house counsel at Fortune 500 companies, government agencies, start-up companies, and individual inventors throughout the world and across a spectrum of technologies.  Additionally, Sheridan handled the Debtor's intellectual property issues prepetition and was already familiar with the Debtor and its intellectual property.

The cost to pursue the Infringement Claims is estimated to range from $250,000 to more than $1,000,000.  Such cost will be funded by a third-party company that invests in intellectual property litigation (the "Funding Source"). The Funding Source is a private entity, and a condition of funding litigation to pursue the Infringement Claims is that its identity must remain private. It has a track record of funding intellectual property litigation and has previously engaged Sheridan for such purposes.  The Retention Agreement is attached to, and incorporated into, the Plan.  However, the primary terms of the Retention Agreement include:

a)  On behalf of Revolar, Sheridan will pursue relief against the alleged infringing parties in the manner it deems most effective, and shall defend against any compulsory counterclaims;

b)  Sheridan shall look solely to the Funding Source for payment of its fees and costs;

c)  The Funding Source is to provide a certain amount of working capital to the Debtor, said amount to be determined in the contract between Sheridan and the Funding Source, though the likely amount is $75,000 ("Working Capital");

d)  Any Litigation Proceeds received due to Sheridan's prosecution of the Infringement Claims shall be distributed as follows: (i) first, to Funding Source in an amount equal to 2 times the working capital; (ii) second, to Sheridan until it receives an amount equal to 2 times all costs and attorney's fees invoiced; (iii) third, any remaining Litigation Proceeds shall be distributed thirty-five percent (35%) to the

> Debtor, thirty-two and one half percent (32.5%) to Sheridan, and thirty-two and one half percent (32.5%) to Funding Source. However, any sale of the Debtor's Patents or substantially all of the Debtor's assets for up to $2.4 million will not be considered Litigation Proceeds.

The Order approving Sheridan's employment necessarily contemplated that Sheridan is to receive a contingency fee under certain circumstances, and was thus issued pursuant to 11 U.S.C. § 328(a). Section 328(a) provides that a professional may be employed on a contingent fee basis, and that a professional's compensation may only be altered under limited circumstances. The Debtor anticipates that Sheridan's fees as of the Effective Date of the Plan will be approximately $6,000. Sheridan will seek approval of such fees, though payment of hourly fees and costs will come from the Funding Source rather than the Debtor. After the Effective Date of the Plan, Sheridan will have no obligation to seek approval of its fees or costs.

### 3.    Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8). The Debtor does not owe any taxes.

### 4.    Classified Priority Claims

**a.    Class 1 Priority Claims**. Allowed Class 1 Claims shall be paid in full on the Effective Date. The Class 1 Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. The Debtor does not expect claims under Sections 507(a)(5). The holders of Allowed Claims of the type specified in Section 507(a)(4) of the Code shall receive cash equal to the allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims. Although one non-insider creditor filed a proof of claim seeking a priority claim pursuant to Section 507(a)(4), as explained in Article V.A.1. above, such creditor may not qualify for such claim.

**B.    Secured Claims.** The Debtor has no secured creditors.

**C.    Non-Priority Unsecured Creditors**

The Debtor has a number of unsecured pre-petition creditors which comprise Class 2. At the time of the bankruptcy filing, the Debtor had unsecured claims as set forth on Exhibit B attached hereto. Based upon the Debtor's analysis of the claims, it is expected that the total

amount of the allowed unsecured claims will be $1,344,771.45. See Exhibit B attached hereto. This figure includes a total of $306,709.70 of Insider claims belonging to Steve Bachar and Victor Lazzaro that will only be paid after all other allowed Class 2 claims have been paid in full with interest.  The total amount of non-Insider unsecured claims is expected to be approximately $1,150,561.75.

**D.     Executory Contracts and Unexpired Leases**

On the Effective Date of the Plan, the Debtor will assume those executory contracts and unexpired leases, which have not been assumed by Order of the Court prior to the Confirmation Date, as set forth in the Plan.  On the date of the entry of an Order confirming the Plan, Debtor shall be the holder of any and all right, title, and interest to the assumed leases and contracts, and as a result, such assumed leases and contracts shall be in full force and effect and shall be binding upon Debtor and the other parties thereto.  Confirmation of the Plan shall constitute a determination that the payments to be made to said creditors pursuant to the Plan satisfy all conditions precedent to assumption and assignment set forth in 11 U.S.C. §§ 365(b) and (f).

As to any rejection of the leases and executory contracts, on the Effective Date of the Plan, the Debtor will reject the executory contracts and unexpired leases to which it is a party listed in the Plan, which have not been rejected by Order of the Court prior to the Confirmation Date.  Executory contracts and unexpired leases will be rejected pursuant to the provisions of 11 U.S.C. § 365.

Any executory contract or unexpired lease not assumed in accordance with the Plan shall be rejected.  All proofs of claim with respect to claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of: (i) the date of the Court order approving the Debtor's rejection of such executory contract or unexpired lease; or (ii) the Confirmation Date.  Any claims not filed within such time shall be forever barred against the Debtor, its estate, and property, and as a result, any such Claims shall be disallowed in full. Claims arising from such rejection, to the extent Allowed, shall be treated as non-priority unsecured Claims.

On its Schedules G, the Debtor listed an unexpired lease between the Debtor and Edgemark Self Storage – Glendale ("Edgemark") for the Debtor's storage unit.  The Edgemark lease is on a month-to-month basis, and therefore, the Debtor does not believe it is executory. The Debtor anticipates that it will continue to utilize the Edgemark storage facility for the

11

foreseeable future.

To the extent any of the Debtor's customer/client contracts or insurance policies constitute unexpired executory contracts, the Debtor intends to assume all of its customer/client contracts. There will be no cost to the estate to assume any contract or lease in this case.

## VI.   DESCRIPTION OF THE PLAN

### A.   General Description

The Debtor's Plan of Reorganization provides for the reorganization of the Debtor under Chapter 11 of the Bankruptcy Code. Pursuant to the Plan, the Debtor shall restructure its debts and obligations and Revolar shall continue to operate in the ordinary course of business.

The Plan provides for the specification and treatment of all creditors and interest holders of the Debtor. The Plan identifies whether each Class is impaired or unimpaired. A Class is unimpaired only if the Plan leaves unaltered the legal, equitable, or contractual obligations between the Debtor and the unimpaired claimants or Interest holders. The following is a brief summary of the Plan. The actual text of the Plan should be reviewed for more specific detail. In the event of any conflict between the Plan and this Disclosure Statement, the terms of the Plan govern.

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Priority Administrative and Tax Claims against the Debtor are not designated as classes. The holders of such Allowed Claims are not entitled to vote on the Plan and such claims will be paid in full. The Plan divides the creditors into separate classes. The classes are set forth as follows:

Class 1 - All Allowed Unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

Class 2– The Allowed Claims held by unsecured creditors.

Class 3 – The Interests in the Debtor.

### B.   Claims

#### 1.   Unclassified Priority Claims

##### a.   Administrative Claims

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Bankruptcy Code, Administrative Claims, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular  holders of such Claims. Such Claims shall be paid in full on the Effective Date of the

Plan, or as otherwise agreed to by the particular holders of such Claims.  Section 507(a)(2) Administrative Claims that are allowed by the Court after the Effective Date of the Plan shall be paid upon allowance.

All Administrative claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing.  Certain professional fees may be paid pursuant to interim fee applications and upon Court allowance.  The professional fees set forth above and below are the total fees expected to remain in the case as of the estimated Confirmation Date of the Plan, assuming minimal litigation over the Plan, and the payments that have been made during the case through retainers or otherwise.

The Debtor anticipates that the only Administrative Claims in this case will be the claim of the Debtor's Bankruptcy Counsel, Kutner Brinen, P.C. ("KB"), and the Debtor's Special Counsel, Sheridan Ross PC. The Debtor retained KB as its bankruptcy counsel.  The Court approved the Debtor's employment of KB on November 27, 2018 *nunc pro tunc* to October 30, 2018.  The Debtor provided KB a retainer in the amount of $10,223, which was approved by the Court on December 10, 2018,  KB estimates that the total legal fees and costs for KB due from the Debtor will increase by approximately an additional $20,000 as of the estimated date on which the Plan will become effective.  The fees could increase or decrease depending on the level of litigation over the Plan.

On March 28, 2019, the Court approved of the Debtor entering into a Retention Agreement with Sheridan as special counsel to pursue patent infringement claims.  The Order approving Sheridan's employment necessarily contemplated that Sheridan is to receive a contingency fee under certain circumstances.  The Debtor anticipates that Sheridan's fees as of the Effective Date of the Plan will be approximately $6,000.  Sheridan will seek approval of such fees, though payment of hourly fees and costs will come from the Funding Source rather than the Debtor. After the Effective Date of the Plan, Sheridan will have no obligation to seek approval of its fees or costs.

### 2.      Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).  The Debtor does not owe any taxes, priority or otherwise.

### 3.      Classified Priority Claims

**Class 1 Priority Claims**.  Allowed Class 1 Priority Claims shall be paid in full on the Effective Date.  The Class 1 claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. Class 1 is impaired by the Plan.  As explained above, one creditor, Jamie Lindsay, filed a proof of claim seeking an allowed claim pursuant to § 507(a)(4).  Such proof of claim was filed late.  Additionally, for the reasons described above, Mr. Lindsay's claim may not qualify as a priority wage claim pursuant to § 507(a)(4).

### 4.        General Unsecured Claims

Class 2 is impaired by the Plan by virtue of the Debtor receiving a discharge pursuant to Section 1141 of the Code. Class 2 claimants shall receive payment in full of their allowed claims plus interest at the rate of four (4%) percent per annum.  Such payment shall be made as follows: Class 2 claimants shall receive a pro-rata distribution equal to 40% of the Gross Revenue generated from the Effective Date of the Plan through December 31, 2021, and sixty (60%) percent of the Gross Revenue generated from January 1, 2022 through the end of the four-year Plan term, less the amount necessary to pay any Administrative Claimant and Unclassified Priority Claimant, who agrees to accept deferred payment of its claim ("Class 2 Distribution"). Commencing on the first full month following the Effective Date of the Plan, the Debtor shall at the conclusion of each month, set aside in a segregated account, an amount equal to the applicable percentage of the preceding month's Gross Revenue. Each time three months of payments have been set aside, the Debtor shall make any payment due to Administrative Expense Claimants and Unclassified Priority Claimants, and then the Class 2 Distribution will be made to Class 2 creditors on a pro-rata basis. In addition to and aside from the distributions made every three months, in the event that the Debtor receives Gross Revenue in excess of $100,000 in any one calendar month, after making any payment due to Administrative Expense Claimants and Unclassified Priority Claimants, the Debtor shall then make a Class 2 Distribution by the 15th day of the following month.  Class 2 Allowed Claimants shall not receive more than the principal amount of their claims plus interest as provided herein.

14

As set forth on Exhibit B, the total amount of Class 2 Claims receiving distributions under the Plan shall be $1,344,771.45. The total amount of non-Insider unsecured claims is expected to be approximately $1,150,561.75.

Class 2 Allowed Claimants who are also Insiders shall not participate in any Class 2 Distribution until the Allowed Claims of all Class 2 Claimants who are not Insiders are paid in full.

The Financial Projections attached hereto as Exhibit C estimates that Gross Revenue over the four-year course of the Plan will total $4,958,995. The projections are shown on a quarterly basis beginning with the fourth quarter of 2019 and ending with the third quarter of 2023.

There are two components of the Debtor's revenue: litigation against parties infringing on the Debtor's intellectual property, and revenue from sales of the Debtor's products. A majority of the Debtor's Gross Revenue is projected to come from litigation, and thus its income is expected to significantly fluctuate due to the inherent unpredictability of litigation and timing of any settlements.

The Debtor's expenses include salaries, technical consultation and monthly technical support, marketing and customer service, financial reporting and accounting, technology upgrades and research and development, manufacturing and shipping, and legal fees and costs. After accounting for such expenses, the Debtor's net income for the four-year Plan term is projected to be $2,313,995, and distributions to Class 2 Allowed Claims over the Plan term is $1,250,836, which exceeds all non-insider claims in the Bankruptcy Case, and will result in payment of all claims in full with interest.

5.      **Interests.**

**Class 3, Interests in Revolar**. Class 3 includes the Interests in Revolar held by the pre-confirmation members. Class 3 is unimpaired by the Plan. On the Effective Date of the Plan all Class 3 interests in Revolar shall be retained by the existing interest holder subject to the terms of the Plan. However, until all Allowed Claims in Class 2 are paid in full in accordance with the Plan and the Confirmation Order, the Debtor shall not declare or pay any dividends or otherwise make any distributions to holders of Interests in the Debtor on account of such Interests.

**C.      Post-Confirmation Management and Compensation of Managers**

After confirmation of the Debtor's Plan, Bachar and Lazzaro will continue as the CEO and acting CFO, respectively, of Revolar.  Mr. Bachar was first introduced to Revolar in the Summer of 2017 by the two noteholders who later filed the involuntary Chapter 7 petition. Shortly after that meeting, Revolar went into an Assignment for Benefit of Creditors.  Mr. Bachar was impressed by the company's potential so sought to purchase the assets.  To do so, he brought in Mr. Lazzaro's company, Volante Capital, to partner in the acquisition.  Mr. Bachar and Mr. Lazzaro intended to serve as active board members and not to take a significant role in the operations of the company which were to be managed by the original operating team.  Over time, however, it became apparent that different leadership was needed and Mr. Bachar and Mr. Lazzaro stepped into their current roles.  Mr. Bachar and Mr. Lazzaro will continue their roles and remain actively engaged going forward as they believe doing so will be in the best interest of all creditors.  Mr. Bachar will receive a monthly salary of $7,500 and Mr. Lazzaro will receive a monthly salary of $7,500.

**D.      Default Provisions Under the Plan**

In the event of a default by the Debtor under the Plan, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan. Any creditor claiming a breach by the Debtor must provide written notice to the Debtor of the claimed default, the notice must provide the Debtor a thirty (30) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtor's failure to cure the default within such thirty (30) day period, the creditor may proceed to exercise their rights and remedies.

**E.      Post-Confirmation Reports**

The Debtor shall continue to prepare and file all required reports under the United States Trustee Operating Guidelines and Reporting Requirements through such time as the Debtor's case is closed.  At any time after confirmation of the Debtor's Plan, creditors may request additional information, including information regarding the Debtor's post-confirmation income and calculations of distributions to creditors, by sending a written request to the Debtor with a copy to counsel for the Debtor.

## VII.    PLAN FEASIBILITY

The Debtor believes that the Plan, as proposed, is feasible.  Approval of the Plan will allow the Debtor to pay creditors in full.  The feasibility of the Debtor's Plan is largely dependent upon the success of the litigation involving the Infringement Claims.  Represented by Sheridan, Revolar has already successfully defended its IP, so has verification of the strength of its portfolio and legal team.  Based upon its relationships in the industry, a careful evaluation done by the Funding Source, and Sheridan's experience, Revolar's management is confident that the IP Litigation will be successful, either through judgment or settlement.  Moreover, the Debtor anticipates that in some cases the mere filing of a lawsuit will result in a negotiated license agreement followed by a withdrawal of the lawsuit.

In the meantime, sales have been steady.  Further, Revolar has a strong agent relationship in the United Kingdom that should generate significant distribution relationships into major sales channels this year. Revolar is also in the final stages of negotiating a licensing arrangement with a major sports brand company with significant retail reach in the United States and 55 other countries. The Debtor's performance during the course of the Chapter 11 bankruptcy case is reflected in the monthly operating reports filed with the Bankruptcy Court.

The Disclosure Statement contains statements which look into the future.  There is no way to determine the accuracy of these statements.  The Debtor has attempted to be conservative in its analysis and believes that the Plan as proposed offers the best option for creditors.  The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.   As set forth more fully below, the Debtor's Plan provides a better alternative to creditors than conversion to a Chapter 7.

## VIII.   TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders.  **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax liabilities as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless

17

the creditor wrote off the debt against income in a prior year in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## IX.    LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to a debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the debtor's assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the debtor's assets and would get a percentage of the distributions from the estate pursuant to 11 U.S.C. § 326, subject to a finding that such compensation is reasonable by the Bankruptcy Court. In addition, the Chapter 7 Trustee would likely hire professionals to aide in the administration of the estate. The Chapter 7 administrative expenses, in addition to any Chapter 11 administrative expenses, would be paid prior to the distribution to the unsecured creditor. In this case, in a Chapter 7, a trustee would likely auction the assets and receive an amount substantially less than what the Plan provides to pay creditors.

Prior to, and during, the pendency of this Bankruptcy Case the Debtor's principals have made extensive efforts to sell the assets for an amount sufficient to provide a meaningful distribution to creditors, but have been unable to obtain any offer. This is due primarily to state of intellectual property law in the United States has changed substantially over the past decade, and is such that selling patents has become very difficult, particularly in cases such as this in which gross revenues are low. Instead, the current typical way to monetize intellectual property is through litigation. Patent litigation poses its own challenges, as it is extremely expensive, and the outcomes are difficult to predict. Because of the expense and uncertainty in patent litigation, most cases require a third party to fund the litigation in exchange for a substantial portion of any recovery. For this reason, Revolar entered into the Retention Agreement with Sheridan Ross PC, pursuant to which a Funding Source will pay for patent infringement litigation. Nonetheless, it is unlikely that a chapter 7 trustee will wait the years in may take to conclude such litigation, which may or may not be successful. Instead, a chapter 7 trustee is likely to auction Revolar's Patents and other assets. When Revolar acquired these assets in 2017 at an auction in California through an assignment for the benefit of creditors, it paid $850,000. If this reorganization is not successful and the case is converted to a Chapter 7 liquidation, that will mean that two different

18

owners have been unable to establish sustained success with Revolar.  In that case, it is difficult to imagine a party paying any amount that approaches what the current owners paid in 2017. Therefore, it is most probably that an auction would attract a significantly lower amount.  Most likely there would be no bid or a nominal bid.  The fair market value of the Debtor's assets as of June 30, 2019 was $451,867.  If this case was converted to a Chapter 7 liquidation, a trustee would most likely be unable to obtain more than one-third of the fair market value of inventory and equipment, or $145,708. Even assuming an additional $250,000 for the Debtor's intellectual property, which the Debtor believes is a best-case scenario, plus $10,000 in cash, the liquidation would produce a total of approximately $405,708.  After paying Chapter 7 trustee's fees of approximately $26,035, the  Class 2 unsecured creditors would likely receive a distribution of approximately $379,673 or less than three (3%) percent of their claims.

| | |
|---|---|
| Intellectual Property | $250,000 |
| Inventory and Equipment | $145,708 |
| Cash | $  10,000 |
| Total | $405,708 |
| Less Chapter 7 Trustee Fees | $  26,035 |
| TOTAL | $379,673 |

In contrast, the Debtor's Plan will pay unsecured creditors 100% of their Allowed Claims, while maintaining the going concern value of the Debtor's operations.

Dated: July 29, 2019

REVOLAR TECHNOLOGY, INC.

By: */s/ Steven Bachar*
Steven Bachar, Chief Executive Officer

Kutner Brinen, P.C. ("KB") has acted as legal counsel to Revolar Technology, Inc. on bankruptcy matters during the Chapter 11 case.  KB has prepared this Disclosure Statement with information provided primarily by the Debtor.  The information contained herein has been approved by the Debtor.  KB has not made any independent investigation as to the veracity or accuracy of the statements contained herein.


KUTNER BRINEN, P.C.

By:    */s/ Jeffrey S. Brinen*

       Jeffrey S. Brinen
       1660 Lincoln Street, Suite 1850
       Denver, CO 80264
       Telephone: (303) 832-2400
       Telecopy: (303) 832-1510
       E-Mail: jsb@kutnerlaw.com

## <u>EXHIBITS TO DISCLOSURE STATEMENT</u>

Exhibit A:    Plan of Reorganization Dated July 29, 2019

Exhibit B:    List of Class 2 Claims

Exhibit C:    Financial Projections